LEFFEL et, Plaintiffs, v. BROWN et, Defendants.
WOODWARD et, Plaintiffs, v. BROWN et, Defendants.

Common Pleas Court, Clark County.

Nos. 52779, 52780. Decided January 17, 1959.

374

Lloyd H. O'Hara, of Vradelis, McCray & O'Hara, Dayton, for plaintiffs in each cause.

Glenn E. Detling, Pros. Atty., Springfield, for the Board of Elections, Clark County, Ohio.

Anson E. Hull, of Durfey, Martin, Browne & Hull, Springfield, for defendant Roland Perkins.

## OPINION

By GOLDMAN, J.

Contest of election petitions were filed in the above two cases and as they involve the same issues they were tried together and submitted together for decision.

They involve three identical local option elections held on November 4, 1958 within German Township, Clark County, Ohio, the voters of Lawrenceville and Tremont City, both located in German Township and

that portion of German Township, exclusive of Lawrenceville and Tremont City, voted separately and for their own respective areas on the same group of issues.

Petition number 52780 deals with the election on these issues for the Village of Tremont City and petition number 52779 the election for German Township, exclusive of Tremont City and Lawrenceville. In each case the "noes" were certified as victors by the Board of Elections for Clark County, Ohio.

The election for Lawrenceville was not contested and is not here in issue.

The matter is before this Court by reason of §3515.08 etc., **R. C.**, which sets forth the procedure to be followed in election contest cases, such as these.

It should be noted at the outset that the Statutes of Ohio do not enumerate any specific grounds upon which an election contest may be based. In determining the questions here involved therefor we apply long established and accepted principles of law frequently enunciated by the Supreme Court of Ohio to govern cases of this nature, which principles the trial courts are bound to respect and follow.

An "election" as that term is used here implies a **choice** by an electoral body at the time and **substantially** in the manner and with the safeguards provided by law with respect to some question or issue. **Foster v. Scarff, 15 Oh St 534.** (Emphasizing throughout this decision is by the Court.)

The ultimate question therefore before this Court is whether or not the electoral body involved in these cases, namely, the authorized voters of Tremont City, on the one hand, and the authorized voters of German Township, exclusive of Tremont City and Lawrenceville, on the other hand, have in fact and in law recorded or expressed a **choice** with respect to the local option issues voted on in those respective areas, and **substantially** in the manner and with the safeguards provided for the holding of such elections.

The petitions each allege that the voting on these local option issues was not fairly and properly conducted and that the votes of the voters in each case were not accurately recorded and each petition alleges identical irregularities occurring both at Tremont City and at Lawrenceville involving the use and operation of voting machines, which they claim did not function properly. They further alleged certain other irregularities in the conduct of the voting places which will be later herein discussed.

The following rules of law dealing with the matter of alleged election irregularities are pertinent and applicable to these cases:

"**Honest mistakes or mere omissions on the part of election officers or irregularities in directory matters, even though gross, if not fraudulent, will not render an election or particular votes cast therein, invalid, unless they affect the results of the election or render it uncertain.**" **19 O. Jur. 2d, p. 144. And again, "Where irregularities in an election are so great and so flagrant in character as to render it impossible to separate the illegal from the legal votes and to raise a doubt as to how the election would have resulted had such irregularities not occurred,**

they must be deemed fatal to the validity of the election and to warrant a rejection of the entire vote of the election district." Otworth v. Bays, 155 Oh St 366.

These citations suggest the yardstick and the rule to be applied in the determination of the issues in the instant cases.

The petitions, the stipulations entered into by counsel, and the evidence offered at the trial, set forth the following irregularities claimed and they and the findings of the Court with respect thereto are as follows:

(a) "That persons other than qualified voters were permitted to enter the voting machines in company with said voters in violation of Statute."

The Court finds no substantial evidence in the record to support this alleged irregularity.

(b) "That certain officials working at the voting precincts during the election were not properly sworn or otherwise qualified as required by law."

With respect to this alleged irregularity it is admitted that one of the challengers was not sworn as required by law before undertaking his duties. However, the record fails to disclose any evidence whatsoever indicating the activity, if any, in which this challenger engaged during the course of the election on November 4. Thus the Court finds that such irregularity was a technical one having no effect or bearing on the results of the election and entitled to no consideration in its determination of the ultimate issue in these cases.

(c) "That the statements of issues as they appeared on the voting machines were erroneous and defective in that they specifically referred to 'five' issues whereas in fact 'six' issues were to be voted on."

With respect to this alleged irregularity an examination of the ballot forms actually in use on the voting machines and as they appeared on election day, and consideration of the pertinent statutes of the Revised Code which compels the grouping of the first five issues in separate form and style, the Court finds that no irregularity existed with respect thereto and that no finding that voters were misled thereby can be substantiated.

(d) This leaves for final consideration those irregularities based on and pertaining to the condition of the voting machines themselves and more particularly the manner in which they were operated and used with which most of the evidence is concerned.

With respect to these irregularities plaintiffs claimed that the machines failed to function in that they did not record the votes actually cast.

The evidence however, clearly establishes that on the contrary, the votes actually cast were indeed recorded and tabulated and it is this fact as will later herein appear, which is responsible for the serious problems which resulted.

Plaintiffs further complained that voters not qualified to vote on the respective local option issues were permitted to and in fact did so vote and the evidence discloses and it is in fact admitted by all of the

parties hereto that in this respect some irregularities did in fact occur. The plaintiffs claim these irregularities were fatal and the defendants minimize or dismiss the effect of these irregularities contending that they were not so serious as to warrant a rejection of the results as certified by the Board of Elections.

The evidence disclosed that voters for both Tremont City and a portion of German Township, exclusive of the Village of Tremont City and Lawrenceville voted at the two voting machines in Tremont City. Voters for the Village of Lawrenceville and that portion of German Township outside of that village both voted on the two machines in Lawrenceville. Voters of German Township South, the remaining precinct in the Township voted on one machine situated at a church elsewhere within the township. There were no irregularities alleged or complained of with respect to the latter machine.

Thus voters using the two Tremont City Machines were both village residents who were qualified to vote only on the group of local option issues that applied to Tremont City alone, plus residents outside of the village who were qualified to vote only on the local option issues as they applied to German Township, exclusive of the Village of Tremont City and Lawrenceville. The same situation existed at the Village of Lawrenceville. Thus in both villages two separate groups of voters used the same voting machines to vote separately on local option issues.

Under normal voting procedures, voters, applying to vote, after being first qualified as to their residence were handed "authority slips," which were either white or blue, depending upon whether they resided in the village or township, and upon which instructions were printed, the effect of which was to clearly indicate to the precinct official operating the voting machine, which set of issues that voter was entitled to vote on. The slip instructed him on how to set the machine in order to accomplish this purpose. The precinct official operating the machine, upon receiving this slip, noting its color and reading the instructions printed thereon, was then required to set the voting machine in accordance with the instructions on the slip so that one or the other of the two sets of local option issues would be "locked out" thus making it possible for the voter to vote only that set of issues that applied to his particular residential area, at the same time "locking out" the other set of issues for which he was not qualified to vote. Thus if the official operating the machine followed these instructions correctly, the voter upon entering the voting machine would find it physically possible to move only those levers appearing on the set of issues that applied to his residential area and physically impossible for him to move the levers that applied to those issues that were "locked out." At both Tremont City and Lawrenceville the issues for the village and for the township respectively, appeared on separate rows on the face of the machine.

The foregoing was the normal procedure that was supposed to be followed on the two machines at Tremont City and the two machines at Lawrenceville.

The precinct official operating the machine accomplished this "lock out" of one group of issues or the other by using two levers situated at opposite sides, on the outside of the voting machine, the correct use of

which would "lock out" one of the two sets of issues in accordance with the circumstances and conditions hereinbefore described. One of the levers was referred to in the evidence as the "primary lever" and the other as the "lock-out lever."

The confusion that arose and the irregularities complained of which form the principal grounds upon which these petitions are based resulted from allegations that the election officials who manually operated the voting machines at Tremont City and Lawrenceville erroneously and improperly handled and manipulated the levers on the outside of the voting machines so that a voter qualified to vote on only one set of issues, in using the machine, nevertheless could and in many instances did move the levers for both sets of issues that appeared on the ballot, thus in effect voting on both village and township issues.

Thus, as a concrete example, a voter, resident of German Township outside of Tremont City, in voting at Tremont City, could, if he chose, vote not only on the issues that pertained to German Township outside of the village, but also for the local option issues for Tremont City as well, or vice versa, and when that happened, it was undisputed that his votes on both groups of issues would be recorded and tabulated.

The evidence discloses that not only could this have been done, but that it actually was done in many instances. It should be added that this happened without any conscious knowledge on the part of the voter that he was doing anything wrong or improper. Some of the witnesses testified that inasmuch as they found it possible to move both sets of levers they believed that they were expected to do so as part of their voting and that they realized their error later that same day or sometime thereafter, only upon reflection or after exchanging and comparing similar experiences with other voters.

These irregularities occurred for the greater part at Tremont City where most of the complaints were registered. They most frequently arose out of the manual operation of the voting machine operated by the presiding official, a Mr. Derr, who was made a party defendant in each of these cases, but who did not file an answer or make any appearance in either case and apparently was unavailable to give testimony at the trial, notwithstanding efforts by counsel to secure his cooperation and testimony. In any event his testimony was unavailable to the Court, although the evidence offered by others quite clearly establishes the manner and circumstances under which the voting on his machine took place.

More than a dozen of the witnesses who testified for the plaintiffs, voted at Tremont City. They testified to conditions prevailing there from as early as 6:50 a. m. until 6:30 p. m. election day. Most of their testimony concerned the machine operated by Mr. Derr. In some instances they voted for both sets of local option issues, unaware at the time that they were not supposed to do so, some testified that the voting levers at each set of issues were movable and that they could have voted on both, but discovered the error before leaving the machines and voted only for the one set of issues, still others testified that the wrong set of issues were "locked" out" so that they were prevented from voting

at all on the issues on which they were entitled to vote, and in one instance a witness related an inability to vote on the local option issues because the levers were not movable at all. It was established beyond dispute that each of these experiences could have taken place only in the event the levers on the outside of the machines were incorrectly set.

Four other witnesses, who testified for the plaintiffs, related somewhat similar experiences at Lawrenceville.

In addition to these witnesses there was the testimony of Mrs. Lind, the precinct official who operated the second machine at Tremont City. She frankly related the difficulties which both she and Mr. Derr encountered in the operation of the voting machines from the very opening of the polls early in the morning. She testified to complaints frequently made during the day by voters to the effect that either they could not pull the proper levers or that the wrong group of local option issues was being "locked out." She testified that help was sought from the Board of Elections, which first sent an official to the booth in the morning just as the polls opened. The complaints continued throughout the morning and further help was sought. In answer to further request for aid, at 10:50 a. m. Mr. Hise, the voting machine custodian, employed by the Board of Elections, an expert trained in the maintenance and use of the voting machines, arrived and remained at the machines at Tremont City until 1:30 p. m. in the afternoon, during which time he further instructed the officials on the proper use of the outside levers. She testified that in order to prevent further difficulties and errors in the operation of her machine, Mr. Hise set the levers so that if not further moved, only German Township voters, from outside of the village of Tremont City, could vote on local option issues. This was to relieve her of the duty to change the positions of the levers on the outside of her machine and thereby avoid the confusion which had by her own admissions prevailed earlier in the morning. Thus under the latter arrangements, voters of Tremont City were to use for the remainder of the day, only the machine operated by Mr. Derr. Her testimony further revealed that there was considerable confusion and uncertainty throughout the morning of election day with respect to the proper operation of the levers on the outside of both voting machines. She stated that because of her own admitted errors in manipulating her machine, she feared that all votes cast by Tremont City voters on the local option issues were not even recorded. There is a conflict in the testimony as to whether or not Mr. Hise advised her to that effect. He denied her claim that she was so advised by him.

The testimony of Mr. Hise is illuminating and important and for the most part undisputed. He testified that he received the call concerning the complaints at Tremont City about 10:30 a. m. and arrived there at 10:50 a. m. Upon arrival he found that Mr. Derr's machine was improperly set, in that at that particular time he was using only the "primary lever" on the outside of the machine and completely ignoring the "lock out lever" on the outside of the machine, as a result of which voters using that machine could, if they wished, have voted on both sets of issues. He further testified, **and it is undisputed,** that when that

happened both sets of votes would be recorded and tabulated and reflected in the election results. He further testified that he set the machine operated by Mrs. Lind so that it would record only the votes of German Township voters outside of the village with Tremont City voters required to use Mr. Derr's machine. He testified that he did this because he found Mrs. Lind in too nervous a condition to properly operate the machine levers.

He testified further that he stayed in the precinct, assisting and instructing the officials in the operation of the machines from 10:50 a. m. until 1:30 p. m., over two and one-half hours, although only he and one other employee were available to service the voting machines throughout the county, a fact which of itself suggests the extent and magnitude of the confusion that attended the voting at Tremont City that day. He testified further that the machines themselves were not mechanically defective, but that the errors which did occur were the result of their improper operation and more specifically that Mr. Derr was not following the instructions on the authority slips with respect to the setting of the levers. He stated also that when he left the booth at 1:30 p. m. the automatic vote tabulator on the outside of the machines indicated, that by 1:30 p. m. that afternoon, 100 voters had already voted on Mr. Derr's machine and that 98 voters had voted on Mrs. Lind's machine. Under questioning by the Court he estimated that during his stay there, from 10:50 a. m. until 1:30 p. m., about 30 voters had voted, which means that up to 10:50 a. m., during which period most of the complaints occurred, approximately 168 voters from both Tremont City and the Township had already cast their ballots on the two machines at Tremont City.

What bearing should all of this testimony have on the questions which the Court must consider in deciding these cases?

It should be stated first of all that fraud is not a factor in these cases. None was claimed, and the evidence fails even to suggest that any was practiced.

Now it becomes necessary to apply the principles and rules laid down by the Supreme Court of Ohio, as cited earlier in this decision to the evidence in these cases.

Were these irregularities which were abundantly established and to a great extent admitted, so great and so flagrant in character as to render it impossible to separate the illegal from the legal votes and to raise a doubt as to how the election would have resulted had such irregularities not occurred?

In applying this yardstick first to the election for Tremont City Village on the local option issues, a glance at the votes on the six issues voted on, reveals a comparatively wide range of feeling with respect to the different issues involved. Voters who voted "yes" on some of the issues voted "no" on others. The highest "yes" vote was 59 on issue number 6, which had to do with the sale of beer, and the lowest "no" vote was 77 on issue number 2, which related to the sale of wine, a difference of only 17 votes. Recall now that a total of 173 voters from Tremont City were the only ones eligible to vote on these issues as they applied to Tremont City and 168 votes had already been cast up to

10:50 a. m., in the morning, when Mr. Hise arrived and found the situation above described and presumably thereafter clarified the procedures. Recall further that these 168 voters were from both village and township and that there is no way of now separating their votes and that they could have voted on either or both sets of issues, and recall further that the evidence discloses that a good many voters had in fact done so.

In the light of these facts the court must conclude and find that it is impossible to separate the illegal from legal votes and that in the light of the evidence there is great and serious doubt as to how the election for Tremont City Village would have resulted on at least some of the six issues involved, had such irregularities not occurred.

The Court wishes to repeat and emphasize that the situation which compels the conclusions above reached was not the result of conscious wrong-doing on the part of anyone involved in the election proceedings or by any of the parties involved in these suits, but were purely the result of what counsel frequently referred to as "human errors" which the Court understands and with which it sympathizes and no censure of any of the parties involved is intended or inferred by any of the statements herein made. The unmistakable fact nevertheless remains that errors did occur and that they did cause the uncertainties which compel this Court to seriously doubt whether the authorized voters of Tremont City did in fact record or express "a choice" on the local option issues before them, as certified by the Board of Elections.

For these reasons the Court finds for the Plaintiffs in case number 52780 and orders that the election as to the local option issues for Tremont City be set aside.

Applying the same principles to case number 52779, which involves the election for German Township, exclusive of Tremont City and Lawrenceville, the Court concludes otherwise.

No question was raised about the single voting machine at German Township south precinct.

The evidence given by the 4 witnesses who testified with respect to the voting at Lawrenceville failed to disclose anything comparable to the pattern of error and confusion that prevailed at Tremont City. At most they appeared to be isolated instances and had no appreciable or decisive effect on the results of the election for German Township as a whole.

An examination of the results for German Township in all 3 voting precincts discloses such an enormous majority of "no" votes over "yes" votes that even if the total number of authorized voters from the Village of Tremont City, to wit 173, regardless of whether they voted "yes" or "no," were deducted from the "no" votes recorded on each of the "six" issues for German Township there would still be a large majority in favor of the "no" votes on each of the 6 issues presented. If in addition to this the total number of authorized voters for the Village of Lawrenceville, to wit, 72, regardless of how they vote on these six issues were, in addition to the Tremont City voters, subtracted from the total "no" votes recorded for the township the results would still be the same for each of the six issues presented.

382

Under these circumstances and employing the same yardstick applied to the Tremont City case, the Court finds that whatever irregularities occurred, even though interpreted in the most unfavorable light, were not so great as to raise a doubt as to how the election for German Township would have resulted had such irregularities not occurred.

For these reasons the Court finds in favor of the defendants in case number 52779 and the election on the local option issues insofar as German Township is concerned may stand as announced and certified by the Board of Elections.

The restraining order heretofore issued against the Ohio Department of Liquor Control in case number 52779 is dismissed.

Counsel may prepare and submit an entry incorporating the findings and conclusions announced in this decision.