IN RE THE ELECTION ON THE ISSUE OF ZONING THE SOUTHEASTERLY SECTION OF SWANTON TOWNSHIP.

[Cite as In re Election of Swanton Twp. (1982), 2 Ohio St. 3d 37.]

(No. 82-158—Decided December 15, 1982.)

*Mr. David L. Karmol* and *Mr. Richard D. Stichter,* for appellants.
*Johnson & Moore Co., L.P.A.,* and *Mr. Willard A. Johnson,* for appellee.

*Per Curiam.* The issue presented in this case is whether, in accordance with established Ohio precedent, the evidence presented demonstrated irregularities sufficient to render the election results on the issue of zoning of the southeasterly portion of Swanton Township invalid.

This court is very much aware of the limitations on its power to intervene in the electoral process and has long adhered to the position that, "[t]he survival of our system of government requires that proper respect be given to the will of the people as expressed at the ballot box." *MacDonald* v. *Bernard* (1982), 1 Ohio St. 3d 85, 86.

Resultantly, this court has set a rather stringent standard which must be met in order to set aside an election. In *Otworth* v. *Bays* (1951), 155 Ohio St. 366 [44 O.O. 344], paragraph one of the syllabus, this court held:

"Where irregularities in an election are so great and so flagrant in character as to render it impossible to separate the illegal from the legal votes and raise a doubt as to how the election would have resulted had such

irregularities not occurred, they must be deemed fatal to the validity of the election and warrant the rejection of the entire vote of the election district."

And in *Mehling* v. *Moorehead* (1938), 133 Ohio St. 395, 408 [11 O.O. 55], this court stated that, "* * * unless it is shown that the [election] result was contrary to the will of the electorate, it will not be disturbed."

In applying these standards, this court has consistently held that there must be an affirmative showing that enough votes were affected by the alleged irregularities to change the result of the election. This standard has been used in cases where election results have been invalidated (see, *e.g., In re Carthagena Local School Dist.* [1958], 80 Ohio Law Abs. 228 [7 O.O.2d 470]; *Leffel* v. *Brown* [1959], 80 Ohio Law Abs. 373) as well as in those cases where the election results have been confirmed (see, *e.g., Woodward* v. *Brown* [1959], 80 Ohio Law Abs. 373; *Mehling* v. *Moorehead, supra*). It is within this framework that this court examines the evidence presented in the instant case.

The record in the instant case well supports the conclusion of the trial court judge that contestors-appellants failed to make an affirmative showing that enough votes were affected by the alleged irregularities to change the result of the election. As the trial court noted, "* * * while the testimony tended to show that an unspecified number of unqualified electors may possibly have had the opportunity to vote on the issue in contest, none of said alleged unqualified electors was identified, nor was there any testimony whatever to indicate whether or not they did in fact vote on said issue or how they voted, if at all."

And, "* * * while there was testimony that for a portion of the day during which the polls were open, certain persons who were not identified were not permitted to vote on a certain voting machine until the issue which was erroneously omitted was placed on the voting machine and the settings thereon were corrected, there is no testimony whatever that said persons were in fact qualified electors, or that they did not in fact cast their votes later, only one voter inconvenienced by the shutdown indicated he could not come back to vote at a later time, nor was there any testimony as to how many such persons, qualified or unqualified, were involved."[1]

In short, contestors-appellants simply failed to prove their case. It is indeed noteworthy that while contestors-appellants named seven individuals in their answers to interrogatories who allegedly were permitted to vote on the zoning issue though ineligible, these individuals were not called as witnesses, nor were they named by the witnesses who did testify.

Furthermore, the number of illegal votes cast could have been affirmatively established as illustrated by the following testimony of an election official:

---

[1] There is no question that contestors-appellants had the ability to call as witnesses any voter ineligible to vote on the zoning issue who might have done so, for R.C. 3515.12 provides, in part, that "* * * [a]ny witness who voted at the election may be required to answer touching his qualifications as a voter and for whom he voted."

"A. Yes. The only way that I think it could be approached, Your Honor, would be if we had those authority-to-vote slips.

"By way of explaining a little procedure, I would give them the authority-to-vote slip to take to the machine and I would mark them as to whether they were Anthony Wayne and whether they were north or south of the line and they would then take these little tickets and tear them in half and stick them in a paper sack at the end of the machine.

"Now, if those tickets could be resurrected, those numbers of the tickets could then be tied to the voter on the pollbooks and a determination made as to whether they could have voted illegally or not because I had marked those people who were north of the line with an N."

This process, however, was never employed.[2]

Since contestors-appellants voluntarily relied on the indefinite testimony of election officials rather than attempting to affirmatively show how many illegal votes were cast, this court can only speculate as to whether enough votes were affected by the alleged irregularities to change the outcome of the election.[3] Mere speculation has never in the past, nor will it now, cause this court to disenfranchise the voters of the state of Ohio.

For the foregoing reasons, the judgment of the Court of Common Pleas of Lucas County is affirmed.

*Judgment affirmed.*

CELEBREZZE, C.J., W. BROWN, SWEENEY, LOCHER, HOLMES, C. BROWN and KRUPANSKY, JJ., concur.

---

[2] It is noted that no exhibits were filed with this court. The exhibits included ballots, a poll list and pollbooks.

[3] The testimony as to the number of votes affected by the irregularities can be described as vague at best. Election officials testified that "five or six" persons may have voted illegally and that one person may have been prevented from voting. Even if it is assumed that seven votes were affected by the irregularities and that these votes would have all been cast against the zoning issue, the outcome of the election would be unchanged since the margin of victory as certified by the board of elections was ten votes.