MIRLISENA *v.* FELLERHOFF ET AL.

(No. A-83-09561—Decided
January 4, 1984.)

Court of Common Pleas of
Hamilton County.

*Mr. John A. Lloyd, Jr.,* for plaintiff.
*Mr. Donald J. Mooney, Jr.,* and *Mr. Timothy M. Burke,* for defendant Fellerhoff.
*Mr. Arthur M. Ney, Jr.,* prosecuting attorney, and *Mr. James Harper,* for defendant Hamilton County Board of Elections.

CRUSH, J. The petitioner, John Mirlisena, has filed the within action pursuant to R.C. Chapter 3515 to contest the results of the 1983 city of Cincinnati councilmanic election, as such results pertain to petitioner and to respondent, Sally Fellerhoff.

The results of such election, as recounted, show that Mirlisena received 38,265 votes and that Fellerhoff received 38,327 votes. Thus, Fellerhoff was the winner by sixty-two votes in an election where Fellerhoff and Mirlisena together received a total of 76,592 votes.

The court is limited to one of four possible judgments, to wit:

1. Fellerhoff was elected, or
2. Mirlisena was elected, or
2. The election resulted in a tie vote, or
4. Neither Fellerhoff nor Mirlisena was elected and the election is set aside. (R.C. 3515.14; *Hitt* v. *Tressler* [1983], 7 Ohio St. 3d 11.)

The various irregularities in the election, alleged by Mirlisena, are not to be considered abstractly. In the final analysis, any irregularities complained of are mooted unless they are significant enough to have rendered the results of the election uncertain, *i.e.,* to have changed the results of the election:

"An election contest may not be maintained unless the matters complained of would have changed the result of the election." 29 Corpus Juris Secundum (1965) 690, Elections, Section 249.

"The petition * * * avers that the contestor was duly and legally elected to * * * office. It necessarily follows * * * that it is the claim of the contestor that these errors, mistakes and irregularities complained of, prevented a fair count of the ballots cast for him and his opponents, and that by reason thereof the wrong result was declared. Any further allegation in this respect would be unnecessary and redundant." *Thompson* v. *Reddington* (1915), 92 Ohio St. 101, 112.

"Next we turn to the merits of this appeal; namely, whether the record supports a finding that this election was

altered as a result of the voting machine failure. A court may not set aside an election unless the proved irregularities demonstrate that the result is uncertain. * * * *In re Election of Swanton Twp.* (1982), 2 Ohio St. 3d 37." *Hitt* v. *Tressler* (1983), 4 Ohio St. 3d 174, 177.

"* * * [T]his court has consistently held that there must be an affirmative showing that enough votes were affected by the alleged irregularities to change the result of the election." *In re Election of Swanton Twp.* (1982), 2 Ohio St. 3d 37, 39.

Acceptance of votes illegally cast and the denial of the right to vote to qualified voters are equally irregularities:

"An election is void if enough persons were unlawfully deprived of an opportunity to vote, or legal votes were thrown out, to change the result * * *." 29 Corpus Juris Secundum 596, Elections, Section 211.

It is evident that the court need not look behind the votes illegally rejected to determine for which candidate the voter would have voted:

"* * *[O]ne hundred forty votes were unaccounted for [the voting machines having failed to work]. Appellee needed only seventy-four of those to defeat appellant. This is sufficient to demonstrate that the election's result is uncertain." *Hitt* v. *Tressler* (1982), 4 Ohio St. 3d 174, 177.

Although it is generally necessary for the contestor in an election contest to prove that the irregularities would have changed the result of the election, it is not always necessary to show the precise number of irregularities:

" 'If, however, the irregularities are so widespread and general and of so flagrant a character as to raise a doubt as to how the election would have resulted had they not occurred, they are deemed to be fatal and will warrant the rejection of the entire vote of the election district * * *.' " *Otworth* v. *Bays* (1951), 155 Ohio St. 366, 370 [44 O.O. 343].

The basic factual question before the court is, therefore, whether sixty-two or more voters were illegally denied the right to vote (there being no claim that votes were illegally cast), or whether widespread, flagrant irregularities have raised a doubt as to the entire election.

Various presumptions and burdens are applicable to election contests:

"In a contest proceeding, the action of the election officers in conducting the election, and in * * * declaring the result thereof, is attended with a prima facie presumption of regularity. * * *" 37 Ohio Jurisprudence 3d (1982) 566, Elections, Section 209.

"In an election contest the burden ordinarily rests upon the contester to establish his claims." *Id.* at 567.

"Every reasonable intendment must be in favor of the validity of an election, and against holding it void for uncertainty." *Mehling* v. *Moorehead* (1938), 133 Ohio St. 395, 403 [11 O.O. 55].

We will now proceed to discuss irregularities specifically alleged by petitioner.

The polling place for precinct 11D was changed from its previous location. Petitioner claims that the location was selected contrary to mandatory statutory requirements, and was so inconvenient as to have disenfranchised many voters, specific examples of whom are Charlie Matthews and Gail Buschard.

R.C. 3501.18 provides in pertinent part as follows:

"The board of elections may divide a political subdivision * * * into precincts and * * * rearrange * * * the several election precincts * * * and change the location of the polling place * * * to provide for the convenience of the voters. * * *

"* * * In order to provide for the convenience of the voters, the board may locate polling places for voting * * * outside the boundaries of precincts, provided that the nearest public school or public building shall be used if the board deter-

mines it to be available and suitable for use as a polling place. * * *"

The requirements pertaining to change of polling place are mandatory before an election, directory thereafter:

"In order to constitute a valid election the place of holding it must either be fixed by law or designated by legally authorized officials. With respect to the calling of * * * an election, statutory provisions relating to the place of an election are mandatory, and will be strictly enforced in a direct action instituted before an election; but after an election such statutory requirements have been held to be directory." 29 Corpus Juris Secundum 176, Elections, Section 78.

"Most courts generally follow the rule that before an election statutory regulations governing place of voting are construed as mandatory and subject to strict enforcement. After the election, however, such regulations are ordinarily construed as merely directory." 26 American Jurisprudence 2d (1966) 61, Elections, Section 228.

"As voters have no absolute right to vote at any particular place, polling places may be changed by legislative sanction." 29 Corpus Juris Secundum 177, Elections, Section 177.

The question here is basically whether the board of elections abused its discretion in the selection of the polling place:

"Where the statute [regarding selection of polling place] vests discretion in officials or boards, the choice by them of a polling place will not be disturbed by the courts unless it is so arbitrary, unreasonable, and capricious as to constitute a plain abuse of discretion." 29 Corpus Juris Secundum 554, Elections, Section 199.

In this case, the polling place was changed after the board was informed that the previous polling place was no longer available. The new place selected was reasonably calculated to be located relatively midway up the hill on which the precinct is located. Thus, the new location may have been more convenient for those voters living higher up the hill, less convenient for those living lower on the hill. The old location was lower on the hill, and thus may have been more convenient for the lower voters, less convenient for the higher voters. The new location was selected with a view to complying with R.C. 3501.29(B) which requires that a polling place be free of barriers for the benefit of the handicapped. It is certainly arguable that a better site could have been selected or that more work might have been done in selecting the site. However, petitioner has not shown that the site was located fraudulently or with deliberate intent to disenfranchise voters.

The court must be ever mindful in an election contest that it has been delegated responsibility in a basically political matter and is not free to create criteria that may, in its opinion, be more suitable than those the legislature has established:

"It has been definitely held by this court that an election contest is a political and not a judicial matter * * *." Williams v. O'Neill (1944), 142 Ohio St. 467, 468 [27 O.O. 400].

"* * * [M]any highly technical requirements in election laws exist.

"* * * [C]ourts should be careful not to read requirements into election laws which are not specifically there." State, ex rel. Leslie, v. Duffy (1955), 164 Ohio St. 178, 183 [57 O.O. 371].

"* * * The test for reversing a decision of a board of elections is not necessarily whether this court agrees or disagrees with such decision, but it is whether the decision of the board of elections is procured by fraud or corruption, or whether there has been a flagrant misinterpretation of a statute or a clear disregard of legal provisions applicable thereto." State, ex rel. Hanna, v. Bd. of Elections (1959), 170 Ohio St. 9, 11 [9 O.O.2d 332].

In view of the foregoing, the court finds that the board of elections did not intend to disenfranchise voters or flagrant-

ly abuse its discretion in selecting the polling place for precinct 11D.

Another irregularity alleged by petitioner is that many validly registered voters were denied the right to vote, or were improperly not registered, based on the appearance at various polling places of persons with "voter registration application receipts." These voters were not allowed to vote because their names were not on the buff cards or voters' signature lists.

The voter registration application receipt is part of a larger buff-colored form. The receipt is torn off. The larger part of the form becomes the "buff card," or basic proof of registration, at such time as board of election personnel have verified that the voter may properly be registered.

Petitioner alleges that volunteer registrars, appointed pursuant to R.C. 3503.11(B)(2), failed in many cases to turn in applications for registration to the board of elections; that this failure resulted in the disenfranchisement of many voters; that this disenfranchisement is the fault of the board of elections because the volunteer registrars are agents of the board; and that the number of voters disenfranchised in this manner is sufficient to invalidate the election.

R.C. 3503.11(B)(2) reads in pertinent part as follows:

"Every board of elections shall, upon request, supply registration forms to any person who resides in the county * * *. Any person who serves as a voter registrar under this paragraph shall * * * sign a statement * * * specifying the duties imposed on such person by the law * * *."

There are no Ohio cases interpreting whether such volunteer registrars are agents of the board of elections. On this point, however, we read generally as follows:

"Registration officials are public officers. They are generally regarded as agents of the state and not of the political party designating them or of the applicant for registration." 25 American Jurisprudence 2d (1966) 792, Elections, Section 103.

"Registration officials are public officers. Ordinarily, they are agents of the state, and not of the city, or political party designating them, or of the applicant for registration * * *." 29 Corpus Juris Secundum 112, Elections, Section 41.

Respondent argues that the legislature could not have intended that the volunteer registrars be agents of the board of elections because virtually no control over them is established in the board of elections; and, further, the mere number of them (in Hamilton County alone exceeding four thousand) makes control impossible.

Whatever the merits of these arguments, the immediate issue can be decided on other grounds.

Circumstantial evidence may be used to decide election contests:

"Resort may be had to circumstantial evidence in an election contest as well as in any other proceeding." 29 Corpus Juris Secundum 751-752, Elections, Section 282.

No direct evidence has been presented that voters with registration application receipts were qualified voters and improperly denied the right to vote. Petitioner has, therefore, relied upon circumstantial evidence.

The proper application of circumstantial evidence is set out in 1 O.J.I. (1983), Section 5.10, at 144:

"4. Circumstantial Evidence. Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow, according to the common experience of mankind.

"* * *

"6. Inference Upon Inference. You may not build one inference on another inference; but you may make more than one inference from the same facts or circumstances."

With regard to the voter registration application receipt question, numerous inferences must be made before the board of elections can be held to have erred, even if the volunteer registrars are considered agents of the board:

1. That the receipt was furnished the voter by a volunteer registrar:

2. That the buff card was not turned in by the volunteer registrar;

3. That, if the buff card was turned in, the applicant was qualified for registration;

4. That the application was made before the deadline;

5. That the voter presented himself to vote at the proper polling place;

6. That the voter did not, in fact, vote somewhere else;

7. That the person with the receipt was the person to whom it was originally given; and

8. That the receipt was obtained for the current election.

A simple review of the eight inferences just delineated quickly makes it apparent that inference upon inference upon inference must be made to justify petitioner's position. This simply cannot be done. Additionally, we read as follows:

"Ordinarily, a person who is honestly refused the right to vote does not become a rejected voter until he * * * qualifies by showing his right to vote * * *." 26 American Jurisprudence 2d 106, Elections, Section 278.

"* * * this court has consistently held that there must be an *affirmative* showing that enough votes were affected by the alleged irregularities to change the result of the election * * *.

"In short, contestors * * * simply failed to prove their case. It is indeed noteworthy that while contestors * * * named seven individuals in their answers to interrogatories who allegedly were permitted to vote * * * though ineligible, these individuals were not called as witnesses, nor were they named by the

witnesses who did testify." *In re Election of Swanton Twp., supra,* at 39.

"The record in the instant case well supports the conclusion of the trial court judge that contestors * * * failed to make an *affirmative* showing that enough votes were affected * * * to change the result of the election * * *." (Emphasis added.) *Id.* at 39.

In view of the foregoing, the court finds that petitioner has not proven his allegations pertaining to the alleged irregularities just discussed.

Another irregularity alleged by petitioner pertains to individuals who appeared at the polls with notice postcards and who were not allowed to vote because their names were not on the buff cards or on the voter signature lists.

Most of the pollworkers who testified about this alleged irregularity did not look at the postcards closely enough to determine what the names or the addresses were, what precincts were involved, or what date of what year was on the postcard. In one case the precincts were checked on about a dozen cards, and found to involve the precinct in question, but no record was made of the name, address, or date of what year on each card.

This situation is closely allied to the situation involving the voter registration application receipts, to wit, there is no affirmative showing of irregularity, and too many inferences have to be made. Here, the inferences would involve, in any particular case, most or all of the following:

1. That the person bringing in the postcard was the person who received it;

2. That the card was for the precinct in question;

3. That the card pertained to the current election;

4. That the voter had not changed his address;

5. That the card was the most current one;

6. That the card was not in error; and

7. That the person did not in fact vote.

Again, the lack of affirmative evidence prevents the court from reducing the inferences or choosing among them.

For the foregoing reasons, petitioner has failed to demonstrate the validity of this alleged irregularity.

Another alleged irregularity involves a pollworker in precinct 17B telling a voter that he had to vote for nine council candidates, whereas in fact the voter could vote for zero to nine candidates. Respondent points out that the voter was given the correct information at the same time, and that the phrase "vote for not more than 9" was printed on the ballot.

The court has not found, nor have counsel cited, any law on the question of telling a voter that he must vote for the entire ticket. This is certainly, in any case, not a disenfranchisement, but some kind of over-enfranchisement.

Without deciding the issue, however, the court will for the moment deem this conduct to be an irregularity reducing the Fellerhoff total by one vote.

Another alleged irregularity is the alleged failure to send notice postcards to numerous new voters. The evidence for this was the computer notice lists which did not have a number of names of registered voters (over sixty people) listed on them; and, further, that these voters did not in fact vote. Respondent presented in opposition credible evidence that some computer notice lists had not been preserved; and that only about twenty-nine of these voters would have been on lists examined by petitioner.

Although the board of elections may well be faulted for not preserving in their entirety these obviously important lists, petitioner has again failed to present affirmative evidence of irregularity sufficient to allow the court to do more than speculate among possible inferences. Here the possible inferences are:

1. The voters were not notified;

2. The voters were notified but the notice lists were lost or destroyed;

3. The voters didn't vote because they didn't choose to do so, even after notice or with full knowledge of the location of the polling places; and

4. The voters were, in some cases, notified by an earlier mailing.

In this case, the failure of affirmative evidence is glaring and unnecessary. All names and addresses were known, but not one of the allegedly disenfranchised voters was subpoenaed to court by petitioner. In view of the presumption in favor of regularity in election matters (37 Ohio Jurisprudence 3d 566, Elections, Section 209), petitioner has failed to demonstrate irregularity affirmatively on this point.

Another irregularity allegedly arises out of the return as undeliverable of one hundred thirty envelopes mailed on November 4, 1983, by the Over-the-Rhine Community Council from the computer notification list of October 22, 1983. Certainly this mailing raises the possibility that the notification list was incorrect. However, it does not affirmatively establish that the board of election's mailing was equally unsuccessful; or that the addresses were in fact incorrect; or that the voters had not moved. The burden of proof is on the petitioner, and suspicion or possibility does not satisfy this burden.

Irregularities were claimed by petitioner in the notification of approximately twenty specifically named voters primarily in precinct 17D.

An examination of the exhibits revealed that three of the named individuals actually voted; that four of these individuals were in fact on the notification list; that one individual received two notices. As to the remaining twelve individuals, the court will, without deciding the issue at this point, deem them deleted from respondent's sixty-two vote total over petitioner.

Another irregularity alleged by petitioner is the failure of poll workers to con-

tact the board of elections regarding the people who came into the various disputed precincts with notice postcards or registration application receipts, but for whom there were no buff cards and who were not on the signature lists.

The simple fact is that those people who entered polling places with registration application receipts or with notice postcards, but who were not in the buff books or on the signature lists, were on the face of it not eligible to vote in the particular precinct. Efforts on the poll workers' part to help them are laudable, but not required by the greatly detailed election laws. The court will not now, in the pursuit of some ill-conceived judicial affirmative action, create such an obligation. Here again the absence of any affirmative showing of irregularity will not allow the court to do other than speculate on the possibility of irregularity.

### Summation

Counsel for petitioner stated in his final argument that it is not necessary to demonstrate the names and addresses of all disenfranchised voters. He asked rhetorically: how much evidence is enough?

Although it is theoretically possible that the court might infer that sixty-two or more voters were disenfranchised from a showing of a lesser number of disenfranchisements, the inference would have to be based on a solid, affirmative showing of patterns of irregularities. In this case, a total of approximately thirteen voters have been deemed by the court, without deciding the issue, as disenfranchised. Even in the case of these thirteen people, persuasive arguments can be made against disenfranchisement.

Petitioner concedes that he has not proven disenfranchisement of sixty-two or more specifically named voters. Petitioner has also failed to present adequate affirmative evidence of a pattern of irregularities in the election in question. Possibilities as to irregularities have been advanced, but not pursued by the presentation of individual voters whose names and addresses are, in some cases, readily available, and, in other cases, discoverable. Every reasonable inference is required in law to be made in favor of the validity of an election. These inferences have simply not been met or overcome by petitioner.

For the foregoing reasons, the court finds that the election of defendant Sally Fellerhoff to the Cincinnati City Council was valid and proper.

*Judgment accordingly.*